[Civ. No. 24705. Second Dist., Div. Three. Mar. 27, 1961.]

POMONA VALLEY CENTER, INC. (a Corporation), Appellant, v. NASH'S OF POMONA (a Corporation) et al., Respondents.

Donald J. Dunne for Appellant.

Erskine & Tulley and J. Benton Tulley as Amici Curiae on behalf of Appellant.

Hahn & Hahn, Stanley L. Hahn and Loren H. Russell for Respondents.

BISHOP, J. pro The plaintiff had prayed for a declaratory judgment, but not the one that was entered, and so it has appealed. We have concluded that the trial court was warranted in decreeing, as it did, that the activities of the Sperry and Hutchinson Company, which is occupying 6,000 square feet of the premises leased by the plaintiff to the defendant Nash's of Pomona, are not to be taken into consideration in figuring the 3 per cent of the monthly gross sales that the defendant (Nash's of Pomona) agreed to pay as rental, and so we are affirming the judgment.

The plaintiff leased to the defendant (by which term we refer to the defendant Nash's of Pomona and not to its co-defendant, F. C. Nash & Co.), a building in its shopping center for a period of close to 20 years. The rental for the first two years was to be 3 per cent of a basic figure provided for in section 9 of the lease, and thereafter a minimum of $3,500 per month, together with any amount over that, that the 3 per cent might amount to. The vital question on this appeal is, as already suggested, this: In determining the 3 per cent that was the rental to be paid during the first two

*Assigned by Chairman of Judicial Council.

years, and that may have to be taken into account during the balance of the term, is the business done by Sperry and Hutchinson Company a factor?

The answer to this question depends, first of all, upon the provisions in section 9 of the lease. The section begins simply enough: "During the first two (2) lease years Tenant agrees to pay to Landlord monthly as rental for the demised premises an amount equal to three percent (3%) of the monthly gross sales of Tenant, as hereinafter defined. . . ." Then follow provisions that make use of the same 3 per cent to determine whether, throughout the remaining life of the lease, the rental shall be more than $3,500 any month.

The second paragraph of section 9 gets down to the business in hand: "The term 'gross sales' or 'gross receipts' as used in this lease shall include all sales made and all cash and credit revenue of Tenant and any persons, firms or corporations claiming through or under Tenant as subtenant, concessionaire, licensee or otherwise, at, in, upon or from the demised premises, and the store in business conducted therein by Tenant, its subtenants, concessionaires and licensees and all other things of value received or receivable by Tenant, its subtenants, concessionaires and licensees arising from any transaction whatsoever, including orders for sales received in the demised premises and delivered from any other store or place and those involving sales, exchanges of goods, wares and merchandise or other property, whether sold for cash or on a charge basis, collected or uncollected, and including the gross compensation or consideration received or receivable for services rendered to customers in the conduct of business upon the demised premises less the following:" Then follow some five deductible items and then 10½ legal-size pages of provisions, none of which throws any light on our problem.

The Sperry and Hutchinson Company (the "S. & H. Co.," in future references) was in occupation of some 6,000 square feet of the premises leased to the defendant, either as subtenant or in some other relationship that would make the defendant obligated to account for their gross sales, to the plaintiff, if the S. & H. Co. was there engaged in retailing the merchandise that they carried. They were not, however, retailing that merchandise, which still leaves the question for us: Was the nature of their transactions such that it

made the defendant account to the plaintiff for 3 per cent of their total transactions?

The purpose for which the S. & H. Co. occupied defendant's premises was to display the goods that they had on hand to exchange in redemption of their green trading stamps, and to effectuate that redemption. The scheme involved is in such widespread general use, that it need not be described in detail. It is in operation in the great majority of the 50 states of the Union. Customers of drug stores, hardware stores, gasoline stations, and a host of other retail establishments receive, as they pay for their purchases, S. & H. green trading stamps, the number for each sale being based upon the amount of the purchase. These stamps the customers retain, putting them in books given them for the purpose. This they do because they have been educated by advertisements, the distribution of 58,000,000 catalogues, and the experience of their many friends, to know that when they accumulate the requisite number of stamps, they can exchange them for various things: card tables, suitcases, egg beaters and a great miscellany of other objects. These they can obtain, not at the stores where they received the stamps, but at redemption centers, possibly in different localities from where the original transactions took place, the centers being operated by the S. & H. Co. Title to the stamps remains at all times in the S. & H. Co. The articles given in exchange for the stamps by that company, are in common use and may be purchased in many places, but not in the redemption centers; only in exchange for the stamps may they be had there. The various retailers who have the stamps to give to their customers receive them under license from the S. & H. Co. They do pay the company $30 per lot of 10,000 stamps, which they receive to distribute to their customers, but they do not obtain title to them, only the right to make use of them according to the terms of their licensing agreement.

The trial court correctly concluded that the S. & H. Co.'s activities, in the 6,000 square feet it occupied in defendant's premises, resulted in no "gross sales" that were to measure, in part, their rent. The second paragraph of section 9 of the lease is to be read for what it is, an endeavor to define "gross sales" and "gross receipts." ■ The S. & H. Co. was there engaged neither in making sales nor in receiving anything of value for goods or services, but in discharging its obligations, incurred by reason of its dealings with merchants

that had taken place, possibly in their entirety, surely in large measure, in other localities. The words ''from any transaction whatever'' are to be understood in the context in which they appear, and not as though standing by themselves.

The plaintiff and the defendant knew, and agreed, that the S. & H. Co. was to conduct a redemption center in the leased premises. Apt words could have been used in the lease to bring the financial values involved in those transactions into the basis of defendant's rent, but they were not. Nor do we find any interpretation that the parties or anyone else may put upon the requirements concerning sales taxes, to be binding upon the trial court, or this court, in determining what the parties meant by section 9 of the lease.

The judgment is affirmed.

Shinn, P. J., and Ford, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied May 24, 1961. Traynor, J., was of the opinion that the petition should be granted.